❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. **25-967M(NJ)** |
| Records and information associated with the cellular devices | ) |
| assigned call number 602-210-7823 ("Target Cell Phone"), | ) Matter No. 2024R423 |
| further described in Attachment A | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     8/26/2025_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .

*(United States Magistrate Judge)*

x  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*     ☑ until, the facts justifying, the later specific date of _____ 07/18/2026 _____ .

Date and time issued:     8/12/2025 @ 11:14 a.m._____

*Judge's signature*

City and state:     Milwaukee, Wisconsin_____     Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NO. 2024R423**

1.      Records and information associated with the cellular device assigned telephone number **602-210-7823** (referred to herein and in Attachment B as the **Target Cell Phone**), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408.

2.      The **Target Cell Phone**.

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NO. 2024R423**

I.     **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider, the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.   The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from June 1, 2024, to the present:

        i.   Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

   1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location

(longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

  i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

  ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18 U.S.C. 2(a); and Title 21 U.S.C. §§ 843, 846,  and 841(a)(1), involving Jesus PENA-Najera, and others during the period from June 1, 2024, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Records and information associated with the cellular devices<br>assigned call number 602-210-7823 ("Target Cell Phone"),<br>further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **25-967M(NJ)**

Matter No. 2024R423

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ❒ contraband, fruits of crime, or other items illegally possessed;

    ❒ property designed for use, intended for use, or used in committing a crime;

    ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 & 846; 843 and 18 USC 2(a) | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Conspiracy to do the same; and Use of a Communication Facility in Furtherance of a Drug Trafficking Offense. |

The application is based on these facts:

See Attached Affidavit.

    ☑ Continued on the attached sheet.

    ☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 07/18/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**MATTHEW KILBY**    Digitally signed by MATTHEW KILBY
Date: 2025.08.08 14:41:54 -05'00'

*Applicant's signature*

DEA SA Matthew Kilby

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 8/12/2025

*Judge's signature*

City and state: Milwaukee, Wisconsin      Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>
### MATTER NO. 2024R423

Your Affiant, Matthew Kilby, being first duly sworn, hereby deposes and states as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **602-210-7823** (**Target Cell Phone**), whose service provider is AT&T ("Service Provider"), a wireless telephone service provider headquartered at 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.    In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.    Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4.　　I am a Special Agent (SA) with the Drug Enforcement Administration (DEA).  I have been so employed since October of 2019 and am currently assigned to the DEA Milwaukee District Office. Between December of 2019 and October of 2022, I was assigned to the DEA El Paso Division Office in El Paso, Texas. Between October of 2022 and December of 2023, I was assigned to the DEA Las Cruces District Office in Las Cruces, New Mexico.

5.　　As part of my duties as a DEA Special Agent, I investigate criminal violations relating to drug trafficking and money laundering offenses, including criminal violations of federal controlled substances laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. As a result, my investigative experience includes, but is not limited to, physical and electronic surveillance and debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.  More specifically, my training and experience includes the following:

　　　　a.　　I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States, including importing controlled substances from other countries, like Mexico;

　　　　b.　　I have experience conducting street surveillance of individuals engaged in drug trafficking.  I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c.     I am familiar with the appearance and street names of various drugs, including but not limited to, fentanyl, marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.  I know the street values of different quantities of various controlled substances;

d.     I am familiar with the language utilized over the telephone and social media to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e.     I am familiar with drug traffickers' employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity;

f.     I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. Drug traffickers will communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging applications, and social media;

g.     I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h.     I know drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business. I know it is common for persons involved in large-scale drug trafficking and related crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds.  Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years.  These items are maintained by the traffickers within residences, vehicles, or other locations over which they maintain dominion and control;

i.     I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them, including their residences;

j.      It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

k.      It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

l.      Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment;

m.      I know drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

n.      I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

o.      I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

p.      I know drug traffickers commonly maintain addresses or telephones numbers in books or papers or through social media accounts, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s);

q.       I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers, including the use of different social media like Instagram, and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, zip disks, flash memory cards, smart media, and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

r.       Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular/wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data;

s.       I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking; and

t.       I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, handbags, and jewelry. I know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

6.       I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also obtained multiple search warrants and conducted subsequent analysis of social media accounts of those engaged in criminal conduct, including drug trafficking.  I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other

evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence, including items from social media accounts, has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7.    The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; information provided by a confidential source; analysis of public records; controlled purchases of drugs; analysis of social media information; analysis of telephone records; and analysis of financial records. Throughout this Affidavit, reference will be made to "case agents". Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

8.    Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

9.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. 2(a); and Title 21 U.S.C. §§ 843, 846 and 841(a)(1), have been committed by Jesus PENA-Najera and other associates of his drug trafficking organization (collectively, "PENA-Najera DTO"). Further, there is probable cause to believe that the information requested will assist in locating the whereabouts of PENA-Najera. There is also probable cause to believe that the location information described in Attachment B will constitute

evidence of these criminal violations, will lead to the identification of individuals who are engaged in the commission of these offenses, and lead to the whereabouts of a person to be arrested.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## II.     BASIS FOR PROBABLE CAUSE

### A. Background

11.     Since December 2024, case agents have been investigating the drug trafficking organization (DTO) of Jesus PENA-Najera (PENA-Najera), Kendell DAYS (DAYS), Corey FINCH (FINCH), Robert ASKEW (ASKEW), Shakla STEPHENS (STEPHENS), John HARRIS (HARRIS) and others regarding violations of Title 21 U.S.C. §§ 841(a)(1), 843, and 846.

12.     On December 17, 2024, case agents executed an arrest warrant for FINCH and multiple state search warrants in the Racine and Mount Pleasant, Wisconsin areas. As a result, FINCH, ASKEW, and others were arrested. In addition, case agents seized fentanyl powder/pills, crack cocaine, cocaine, heroin, psylocibin, three handguns, and a Central Machinery Shop Press used for pressing cocaine, from FINCH's and ASKEW's residences.

13.     On the same date, during a post-*Miranda*, recorded interview at the Racine Police Department, FINCH admitted that he (FINCH) had purchased fentanyl pills (including the fentanyl pills seized from his (FINCH's) home on December 17, 2024) in Arizona and had transported the fentanyl pills back to his (FINCH's) residence for the purpose of selling the fentanyl pills. FINCH stated that whenever he (FINCH) traveled to Arizona to acquire fentanyl pills, he (FINCH) would

either drive a rental car to and from Arizona or he (FINCH) would fly to Arizona and drive a rental car back to Wisconsin.

14.     During the execution of the above-referenced search and arrest warrants, cellular telephones were seized by case agents from both FINCH (one cellphone) and ASKEW (two cellphones).

15.     On January 7, 2025, a State of Wisconsin search warrant was approved for the contents of FINCH's cellular telephone by the Honorable Danielle Shelton. As a result, case agents began analyzing the contents of FINCH's telephone.

16.     Upon reviewing the data that was downloaded from FINCH's telephone, case agents observed that telephone number 404-992-5781 was listed as one of the assigned telephone numbers for FINCH's telephone. At that time, case agents queried telephone number 404-992-5781 through law enforcement databases.  As a result, case agents received information from the Phoenix Police Department (PPD) Commercial Narcotic Interdiction Unit. At that time, PPD personnel advised that telephone number 404-992-5781 appeared in an investigation PPD had conducted as being used by an associate of HARRIS. According to PPD, HARRIS was a suspected co-conspirator in the seizure of approximately 916.5 grams of fentanyl pills by PPD personnel on July 13, 2024, at the Phoenix Sky Harbor Airport, in Phoenix, Arizona.

**B.  Phoenix Fentanyl Seizure**

17.     According to PPD reports, on July 13, 2024, Transportation Security Administration (TSA) personnel working at Phoenix Sky Harbor International Airport, inside terminal three, had observed an anomaly at the passenger security check point x-ray, inside a carry-on suitcase possessed by/belonging to STEPHENS and HARRIS. During the secondary screening, TSA personnel opened the suitcase, described as a black, soft-shelled, zippered roller with a pull-

up handle. TSA personnel observed a large amount of "blue M30 pills", suspected to contain fentanyl (Figure 1), and notified uniformed officers. The carry-on suitcase with the fentanyl package contained both men's and women's clothing. Specifically, two pairs of men's shoes (size 9.5/10) as well as multiple men's shirts, socks and a belt. Additionally, it contained women's body suits, bras, underwear, and a tank top.



**(Figure 1)**

18.     TSA reported to the responding officers that both STEPHENS and HARRIS abandoned the suitcase and continued up the escalators toward the exit and gate concourses. Officers took possession of the suitcase and suspected drug package and were able to locate and detain STEPHENS. HARRIS was not physically located by officers. Officers advised that HARRIS and STEPHENS were traveling together and were seen on airport surveillance footage entering the security check point passenger lanes. HARRIS was observed pulling the suitcase (Figure 1) while waiting in line and placing the suitcase onto the belt for screening, while STEPHENS placed her handbag onto the belt. Both STEPHENS and HARRIS physically cleared the screening area and were both waiting on the other side of the x-ray machine for the suitcase. However, when the suitcase was flagged and pulled aside for secondary screening, HARRIS

immediately left STEPHENS to wait for the suitcase. Airport surveillance footage showed HARRIS take the escalator up to the gate concourse area where he (HARRIS) exited the secure area, taking an elevator to ground level. HARRIS was then seen on surveillance footage outside the building waiting curbside. HARRIS eventually entered a black passenger car and left STEPHENS at the airport.

19.     STEPHENS was observed abandoning the fentanyl-laden suitcase at the TSA checkpoint; however, STEPHENS returned to the TSA checkpoint on two occasions in an attempt to retrieve the suitcase. At one point, STEPHENS was observed entering the secure area of the secondary screening area, an area restricted to authorized TSA personnel. At that time, STEPHENS was observed reaching for the fentanyl-laden suitcase, however, STEPHENS was confronted by TSA personnel and informed that she (STEPHENS) was not allowed to take the suitcase. STEPHENS then abandoned the suitcase again. STEPHENS was located at the departure gate for her flight and was detained there.

20.     While officers walked with STEPHENS to the police office, STEPHENS initially stated that she (STEPHENS) was by herself and did not have any more bags. At that time, STEPHENS tried to conceal some paperwork within the shorts she was wearing. The paperwork was discovered to be two Delta Airlines boarding passes issued to herself and HARRIS for flight #DL1070 from Phoenix to Detroit. According to flight reservation records, HARRIS and STEPHENS were to board a connecting flight in Detroit to Milwaukee, Wisconsin.

21.     When detained by officers, STEPHENS had the following items belonging to HARRIS in her (STEPHENS') possession:

   a. HARRIS' Delta Airlines boarding pass from Phoenix, Arizona to Detroit, Michigan, to Milwaukee, Wisconsin (inside the shorts STEPHENS was wearing);

b. HARRIS' recently issued social security card, dated April 11, 2024, listing HARRIS' full name "John L. Harris Jr.", social security number XXX-XX-X962 (inside STEPHENS' wallet with her children's social security cards); and

c. HARRIS' State of Wisconsin Department of Corrections (DOC) "travel permit" for the specific dates of March 14, 2024, to March 18, 2024, listing HARRIS' full name as "John L. Harris", date of birth XX/XX/1991, DOC#XXX110. The travel permit was issued on March 11, 2024, and signed by HARRIS' probation officer.

22.     PPD reports indicated that HARRIS and STEPHENS arrived in Phoenix together on July 11, 2024, at 1:12 PM via Delta flight DL2192 (Milwaukee to Detroit) with a connection on Delta flight DL1135 (Detroit to Phoenix). HARRIS and STEPHENS attempted to leave together from Phoenix on July 13, 2024, at 11:00 AM via Delta Airlines flight DLl1070 (Phoenix to Detroit) with a connection on Delta flight DL3971 (Detroit to Milwaukee).

23.     STEPHENS waived her *Miranda* rights and provided a brief interview. STEPHENS stated that she was traveling alone and did not have baggage, only a purse. STEPHENS then admitted that she was traveling with a male companion, known only as "Steve". When asked why she attempted to take the black roller bag out of the TSA screening area, STEPHENS stated that she thought it was her bag, contradicting her previous statements. When asked where her bag was, STEPHENS stated that she told law enforcement officers that she did not know. STEPHENS told law enforcement officers that the bag seized by PPD was not hers and she (STEPHENS) did not know what was in the bag.

24.     On the same date, STEPHENS was again read her *Miranda* rights, which STEPHENS acknowledged and waived once more prior to being interviewed by PPD. STEPHENS initially stated that she was traveling with HARRIS, but then quickly said she was not. STEPHENS also confirmed her residence/mailing address in Racine, Wisconsin prior to requesting that the interview be terminated. During the interview, PPD personnel located a cellphone in STEPHENS'

possessions and seized the cellphone after STEPHENS triggered the cellphone lockout due to excessive incorrect password entries.

25. In STEPHENS' purse, PPD personnel also discovered a receipt from the Milwaukee Airport "Smart Park" parking facility dated July 11, 2024, at 11:45 AM. STEPHENS stated that her personal vehicle, bearing license plates ATX-5227, was parked at the airport in Milwaukee. PPD also discovered a receipt from a Target store located in Goodyear, Arizona dated July 11, 2024. According to the receipt, STEPHENS purchased several health/beauty items and two items of apparel. The apparel was listed on the receipt as two "Wild Fable". When STEPHENS was detained, she was wearing a lime green "Wild Fable" tank top. Inside the suitcase that contained the fentanyl pills, PPD discovered a yellow "Wild Fable" tank top. According to PPD personnel, STEPHENS did not arrive at the airport wearing the lime green tank top. Based on this, case agents believe that STEPHENS changed outfits after the black fentanyl-laden roller bag was selected for inspection, prior to her (STEPHENS') arrest.

26. The pills and packaging were later separated and tested by the PPD Drug Laboratory. A representative sample of the suspected fentanyl pills was tested and confirmed to contain fentanyl. The total gross weight of the fentanyl was approximately 916.5 grams.

27. On February 12, 2025, STEPHENS was convicted in Maricopa County (Arizona) Case No. CR2024-133487-001 DT of attempt to commit narcotics drug transport and/or felony sale of narcotics, in violation of State of Arizona Revised Statutes (A.R.S.) §§ 13-1001 and 13-702. STEPHENS was sentenced to a minimum term of 2.5 years of imprisonment.

28. As part of the investigation into HARRIS and STEPHENS and the fentanyl pills seized at the Phoenix International Airport, PPD personnel obtained Delta Airlines records relating to HARRIS and STEPHENS. Delta flight reservation records indicated that FINCH had purchased

one-way tickets for himself and HARRIS to fly from Milwaukee, Wisconsin to Phoenix, Arizona on June 14, 2024.

29.     Based on the July 13, 2024, fentanyl pill seizure at the Phoenix Sky Harbor Airport involving HARRIS and STEPHENS, the post-*Miranda* statements of FINCH, and the data extracted from FINCH's cellphone, case agents believe FINCH and HARRIS were working together to obtain fentanyl pills in Arizona for transport to Wisconsin.

### C.  Communication between FINCH and HARRIS

30.     On January 7, 2025, case agents began examining FINCH's cellphone extraction data for conversations between FINCH and HARRIS. As a result, case agents identified three conversations between HARRIS and FINCH: two of which occurred via Facebook, and one of which occurred between FINCH (using telephone number 404-992-5781) and HARRIS (using 262-664-3687). Based upon information obtained during the current investigation, case agents are aware that FINCH's Facebook name is "Stoney Otw". Case agents are also aware that "Stoney" is a nickname frequently utilized by FINCH.

31.     Case agents also identified the Facebook profile "Bossman Slug" as the profile utilized by HARRIS. According to State of Wisconsin DOC records, HARRIS has a tattoo on his arm that reads "Lil Slug". Additionally, case agents were able to match photographs from the Facebook profile "Bossman Slug" to booking photographs of HARRIS. Case agents reviewed publicly available Cash App data and determined that the telephone number 262-664-3687 is linked to a Cash App account using profile name "Sack Chasing Slug" and username "$RackChasingSlug". In addition, according to law enforcement databases, telephone number 262-664-3687 is linked to HARRIS with addresses in Milwaukee and Racine, Wisconsin.

32.     Upon examining the publicly accessible information on the Facebook profile "Bossman Slug", case agents observed a post from January 6, 2025. The Facebook post states that "Bossman Slug" is with Shakla Green. The post reads "Happy Bday to da queen I Luv u. Enjoy yo day if I was home it would have been more bags dis yr 🍪🍎 Got u for life" and displays a video of HARRIS purchasing multiple shopping bags of items from Echelon Gallery, located at 3801 Monarch Drive, Racine, Wisconsin. The Facebook post also includes a photograph of STEPHENS next to the video. Upon examination of the Facebook profile of Shakla Green, case agents observed that the URL for the profile is https://www.facebook.com/shakla.stephens. Case agents observed photographs on the Shakla Green Facebook profile matching photographs of STEPHENS taken by PPD on July 13, 2024. Furthermore, the Shakla Green Facebook profile lists Shakla Green as the CEO of KJ Cleaning Services, LLC, a cleaning company in Racine, Wisconsin that PPD identified as being affiliated with STEPHENS. As a result, case agents believe that STEPHENS and HARRIS share a personal, romantic relationship with each other.

33.     In total, the three conversations between FINCH and HARRIS took place between April 11, 2024, and August 6, 2024. The following paragraphs contain a summary of the conversations between FINCH and HARRIS that case agents determined were relevant to this investigation. The summaries are not intended to be verbatim accounts of all the messages between FINCH and HARRIS.

34.     On May 5, 2024, HARRIS, via Facebook, messaged FINCH: "Yoo need 100". Based on training, experience, and the investigation into the DTO, case agents believe that this message refers to HARRIS' wanting to purchase drugs, believed to be 100 fentanyl pills, from FINCH.

35.     On June 13, 2024 (the day before FINCH's and HARRIS' flight to Phoenix), FINCH, via Facebook, messaged HARRIS: "5:28 so mf gotta get there at like 4:45 I went out Milwaukee". Later that day, FINCH sent HARRIS via Facebook, "U gone have mf to take us to the airport". These messages are consistent with FINCH and HARRIS coordinating their transportation to the airport for their flight on June 14, 2024.

36.     On June 16, 2024, FINCH, via Facebook, messaged HARRIS, "My other people's funna hit me when he leave from with his daughter but then mfs a lil more how u wanna play it". Later that day, HARRIS, via Facebook, responded "How much more". FINCH messaged "They 30" and "But bro was finna throw sum on me too I damn near wanna see if he gone get em fr cause dude telling him don't spend the pape". HARRIS responded, "We gone fuck you mean" and "Pape on the line we gone make that shit anyways n come rb". FINCH responded "Bet". HARRIS messaged "Nbs we chasing that shif ain't time to b waiting around when it's thousands ona floor". Based on training, experience, and the investigation into the DTO, including the fentanyl pills seized in July 2024 and December 2024, case agents believe that, on June 16, 2024, HARRIS and FINCH were discussing whether to purchase fentanyl pills from FINCH's supplier for $0.30 per pill, with the hope that the supplier would provide extra pills for FINCH at no additional cost.

37.     In the text message conversation between telephone number 404-992-5781 (used by FINCH) and telephone number 262-664-3687 (used by HARRIS), on June 3, 2024, HARRIS messaged FINCH stating "Yoo lil bro need them again 200 this time he said" and "Need kpack wtw". During FINCH's post-*Miranda* statement, FINCH admitted to referring to packages of 1,000 fentanyl pills as "kpacks". Case agents therefore believe that these messages refer to HARRIS' acquiring 1,200 fentanyl pills from FINCH.

**D.     Communication between FINCH and DAYS**

38.     During the analysis of the data from FINCH's telephone, case agents also observed a conversation between FINCH's telephone number 404-992-5781 and telephone number 414-387-3155, which case agents identified as being used by DAYS. Case agents identified telephone number 414-387-3155 as a telephone number belonging to DAYS because the telephone number was saved in FINCH's contacts list as "KD". Further, during text conversations with each other, DAYS instructed FINCH to make sure that his name was spelled correctly for a Walmart-to-Walmart money transfer, and DAYS spelled out the name "Kendell Days" to FINCH.

39.     Additionally, case agents reviewed publicly available Cash App data for telephone number 414-387-3155, which at the time, was linked to a profile name "Kendell Days", with associated username "$Dizzle016". Over the course of the current investigation, case agents identified DAYS' publicly available Facebook profile. DAYS' Facebook profile has a profile name of "Dizzle" with the associated username "dizzle.303062".

40.     Additionally, photos from the previously mentioned Facebook profile are consistent with DOC and State of Wisconsin driver's license photographs of DAYS.

41.     Case agents determined that DAYS was stopped by police on July 17, 2022, in Racine County, Wisconsin. Inside DAYS' vehicle, officers discovered over 2 ½ kilograms of marijuana, 1.1 kilograms of small blue "M30" pills suspected to contain fentanyl, over $17,000, and other items consistent with large-scale drug trafficking. DAYS was later charged with and convicted of drug-related offenses in Racine County, Wisconsin (Case No. 2022CF1587) and sentenced to prison. DAYS was released from prison on or about May 24, 2024, and placed on extended supervision.

42.     Based on the contents of the messages between FINCH and DAYS, including photographs of large quantities of blue pills believed to contain fentanyl pills (see Figure 2 below),

case agents determined that DAYS is a source of supply of fentanyl pills for FINCH and HARRIS in Arizona. During conversations between FINCH and DAYS, case agents observed that FINCH and DAYS mentioned "Slug" (HARRIS) multiple times, including while HARRIS and FINCH were in Arizona in June 2024.



(Figure 2)

43. The following paragraphs contain a summary of the conversations between FINCH's telephone number 404-992-5781 and DAYS' telephone number 414-387-3155, which case agents determined to be related to this investigation. The conversations are not intended to be a verbatim account of all the messages between DAYS and FINCH.

44. On June 10, 2024, four days before FINCH and HARRIS flew to Arizona, DAYS messaged FINCH "Lmk gang I gotta get myself together….lmk how many too so I can let my ppl kno so wen u touch we not waiting for em". FINCH responded, "IK mf a go for 25". DAYS responded, "Bet that's sweet". FINCH responded, "I'm asking you will yo peoples". Based on training, experience, and the investigation into the DTO, case agents believe that these messages are consistent with FINCH and DAYS discussing how many fentanyl pills FINCH will buy when he (FINCH) arrives in Arizona so that DAYS can order the pills and avoid unnecessary waiting. Case agents also believe that, in these messages, FINCH informed DAYS that he (FINCH) would

be willing to purchase fentanyl pills for $0.25 per pill and was wondering if DAYS' supplier could sell fentanyl pills at that price. Additionally, during FINCH's post-*Miranda* interview in December 2024, FINCH advised case agents that he (FINCH) acquired fentanyl pills in Arizona for close to $0.25 per pill.

45.     On June 16, 2024, DAYS texted FINCH "I hadda run by my og shit but I have the slug the key just make sure yall lock up n everything off if u dip u know u good in my shii gang". Based on training, experience, and the investigation into the DTO, case agents believe that DAYS told FINCH that he (DAYS) had to leave, but that DAYS gave HARRIS the key to DAYS' residence. DAYS instructed FINCH to lock up and turn everything off if he (FINCH) and HARRIS were to leave.

46.     On July 15, 2024, two days after STEPHENS and HARRIS attempted to return to Wisconsin with approximately 916.5 grams of fentanyl pills obtained in Phoenix, DAYS texted FINCH "The nigga slug got 11 thousand caught up…. I gotta wait n see how many left now cuz I already went from 25 thousand to 15". FINCH responded, "How he do that". DAYS messaged, "He split em in half n had somebody else fly the other". FINCH responded, "Man idk why you had him do ts he ain't even gang fr" and "I jus had him to drive bro". Based on the investigation, training and experience, case agents believe that FINCH and DAYS were discussing the seizure of the fentanyl pills from HARRIS and STEPHENS at the Phoenix airport. Additionally, case agents believe that FINCH told DAYS that HARRIS can't be trusted to transport fentanyl pills. Specifically, FINCH only brought HARRIS to Arizona to help him drive fentanyl pills back to Wisconsin.

47.     Based on the above, case agents believe that HARRIS, STEPHENS, FINCH, and DAYS are members of the same DTO that obtained fentanyl pills supplied by DAYS and

transported or attempted to transport the same to the Milwaukee and Racine, Wisconsin areas. Upon arrival in Wisconsin, FINCH and HARRIS sold the fentanyl pills in smaller quantities. Case agents also suspect that, based on the above, the fentanyl pills seized on July 13, 2024, were supplied by DAYS to STEPHENS and HARRIS.

E.     Indictment and Superseding Indictment

48.     On February 19, 2025, FINCH and ASKEW were indicted by a grand jury convened in the Eastern District of Wisconsin for conspiracy to possess with the intent to distribute controlled substances and distribution of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846; and possessing a firearm in relation to a drug trafficking offense, in violation of Title 18, United States Code, Sections 2(a) and 924(c). ASKEW had his initial appearance on March 13, 2025, and FINCH had his on April 10, 2025.

49.     Case agents continued the investigation into the DTO.

50.     On Tuesday, April 15, 2025, DAYS was charged in a superseding indictment by the grand jury in the Eastern District of Wisconsin for conspiracy to possess with the intent to distribute controlled substances and distribution of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846; and possessing a firearm in relation to a drug trafficking offense, in violation of Title 18, United States Code, Sections 2(a) and 924(c). Other members of the DTO, including FINCH, ASKEW, and HARRIS, were also charged in the superseding indictment.

F.     Identification of Drug Source of Supply "Jesus"

51.     On June 11, 2025, DEA Milwaukee and DEA Phoenix conducted an arrest operation in Avondale, Arizona pursuant to an arrest warrant issued out of the Eastern District of

Wisconsin for DAYS for conspiracy to possess with the intent to distribute and to distribute controlled substances; and disturbing controlled substances, in violation of Title 18, United States code, Section 2(a); and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(A).

52. On the same date, case agents successfully arrested DAYS on the arrest warrant and transported DAYS to the DEA Phoenix Office. At that time, case agents met with DAYS in an interview room within the DEA Phoenix Office and conducted a post-Miranda interview with DAYS.

53. During the interview, DAYS stated that in approximately 2020 or 2021, DAYS was selling marijuana in Arizona and that DAYS was contacted by a Hispanic male whom DAYS knew had previously attended Agua Fria High School in Avondale, Arizona, via social media, that DAYS only knew as Jesus, last name unknown (LNU). DAYS described Jesus as a male in his mid to late twenties who is skinny and stands approximately 5'10" to 5'11". DAYS stated that, at that time, Jesus asked DAYS if DAYS would be interested in purchasing "blues" from Jesus. DAYS advised that DAYS is aware that "blues" are a street name for counterfeit oxycodone M30 pills, which often contain fentanyl. DAYS stated that, after Jesus offered to sell "blues", Jesus showed DAYS photos of "blues" and that they began to utilize social medias such as Instagram to further discuss transactions related to fentanyl pills.

54. DAYS stated that DAYS believes that Jesus is a member of a cartel.

55. DAYS then provided case agents with the Instagram profile that DAYS utilized to communicate with Jesus as "_fl1ppaa".

56. Case agents queried Instagram for the profile and discovered the above account which was publicly accessible and contained several photos of a Hispanic male matching the above description of Jesus with a blurred-out face or no face pictured. Additionally, the bio of the profile

stated "Sinaloa MX", and the profile picture displayed a Hispanic male with multiple large, gold-colored necklaces around his neck. Case agents are aware that Sinaloa, Mexico is a base of operations/stronghold for the Sinaloa Cartel.

57.     On the profile for the above Instagram account, case agents also observed multiple posts/stories related to la Santa Muerte. Based on training and experience, case agents are aware that la Santa Muerte is considered by some to be a folk or narco-saint worshipped by criminals and members of cartels for protection and prosperity in their criminal endeavors such as drug trafficking. According to the DEA Museum website, "La Santa Muerte (Saint Death) is a spiritual icon found among members of the Gulf, Sinaloa, and Juarez drug cartels. In Latin American culture, la Santa Muerte statues are painted with different colors to represent specific powers… the statue's symbolism of personal empowerment and terror appeals to drug dealers."[1]

58.     Case agents showed the profile and profile picture to DAYS and DAYS confirmed that "_fl1ppaa" was the profile that DAYS had been speaking about. DAYS stated that DAYS primarily communicated with Jesus via the above Instagram profile regarding fentanyl pills and that they would communicate via direct messages and audio/video calls. DAYS stated that DAYS believes that Jesus currently lives in Sinaloa, Mexico because of his (Jesus') Instagram posts which contain location tags in the Sinaloa area and because Jesus has told DAYS that he is in Sinaloa during calls with DAYS via the above Instagram account. DAYS also believed that Jesus travelled back and forth between the United States and Mexico.

59.     DAYS stated that DAYS began purchasing fentanyl pills from Jesus, via the above Instagram account, in 2,000 to 3,000 pill quantities for approximately $1.50 per pill to $2.00 per pill. DAYS stated that, at that time, Jesus advised DAYS that Jesus could provide DAYS with any

---

1 See https://museum.dea.gov/museum-collection/collection-spotlight/artifact/santamuerte. Reviewed August 6, 2025.

drug or quantity of drugs that DAYS wanted to purchase, however, DAYS chose to only purchase fentanyl pills.

60.     DAYS stated that, in May of 2024 and beyond, DAYS started purchasing larger quantities of fentanyl pills from Jesus, via the previously mentioned Instagram account.

61.     DAYS stated that, in 2024, DAYS made multiple purchases (five to ten) of 100,000 fentanyl pills from Jesus, communicating primarily via the above Instagram account. DAYS stated that, at that time, DAYS was purchasing fentanyl pills from Jesus for $0.30 to $0.40 per pill. DAYS stated that Jesus would send couriers to deliver the fentanyl pills to DAYS and collect money from DAYS, however, DAYS would communicate solely with Jesus via the above Instagram account to establish locations/times of fentanyl pill purchases, quantities of pills to be purchased, and prices per pill. DAYS stated that most of the fentanyl pills that DAYS purchased from Jesus were destined for customers in southeastern Wisconsin.

### G.     Source of Information

62.     Case agents met with a Source of Information (SOI) on July 2, 2025, at which time the SOI's attorney was also present. The SOI stated that between June 2024 and December 2024, DAYS bought approximately 300,000 to 1,200,000 fentanyl pills from Jesus (later identified as Jesus PENA-Najera). The SOI stated that DAYS would communicate with Jesus primarily via the above Instagram account, identified as "_fl1ppaa", to conduct drug trafficking activities. The SOI stated DAYS would then sell fentanyl pills to customers in southeastern Wisconsin.  Additionally, the SOI was aware that DAYS paid Jesus for fentanyl pills via a Cash App account on some occasions. The SOI stated that Jesus would provide the recipient Cash App account via the above Instagram account to DAYS.

63.     The information provided by the SOI is credible and reliable, the SOI has given information concerning individuals involved in illegal activities which has been independently verified through this investigation. The information has been verified through arrests, drug seizures, post-arrest interviews with conspirators, social media analysis, phone extraction data analysis, and queries through law enforcement databases. The SOI is cooperating with law enforcement for consideration on pending federal drug charges. The SOI has no arrests or convictions relating to dishonesty but has had past arrests or convictions for felony drug offenses.

64.     On June 17, 2025, case agents submitted a preservation letter to Meta for the "_fl1ppaa" and were notified that data from November 17, 2023, to June 17, 2025, would be preserved.

65.     Around July 11, 2025, case agents reviewed data publicly available on the above Instagram account and observed that Jesus (later identified as Jesus PENA-Najera), appeared to have deactivated the "fl1ppaa". On July 12, 2025, case agents located an account bearing username "ceo_fl1ppaa" and URL https://www.instagram.com/ceo_fl1ppaa/, which appeared to now be operated by Jesus. Case agents suspect this account to be operated by Jesus because both accounts have usernames that contain "fl1ppaa", both accounts contain references to "CEO", and the bio of "ceo_fl1ppaa" states "NEW ACCOUNT MFS HATING". Additionally, the account appears to have been created in close proximity to the deactivation of "_fl1ppaa". The new account also contains one photo of a Hispanic male wearing a shirt that case agents observed in photos on the "_fl1ppaa" profile, prior to its deactivation.

**H.     Instagram Search Warrant on "_fl1ppaa" and Identification of Jesus PENA-Najera as Jesus LNU and user of "_flippaa" and "ceo_flippaa"**

66.     On July 16, 2025, your Affiant submitted an administrative subpoena to Agua Fria High School, for student profiles and photos of all students with the first name Jesus or Carlos.

67. On July 18, 2025, Magistrate Judge Stephen Dries authorized a search warrant for the data related to the Instagram account bearing username "_fl1ppaa" believed to be used by Jesus LNU to engage in drug trafficking. On the same date, your Affiant submitted the warrant to Meta for processing. On July 21, 2025, Meta returned the requested records. At that time, case agents began to review the records provided by Meta.

68. On July 22, 2025, your affiant located a photo within the data provided by Meta that appeared to be the user of the account "_fl1ppaa". At that time, case agents showed the photo to SOI, who has seen Jesus LNU in person and via video chats as recently as June of 2025. At that time, the SOI confirmed that the photo was of Jesus LNU's face.

69. On July 26, 2025, Agua Fria High School returned the requested student profile data. Subsequently, case agents began to review the records for student photos matching the photo from "_fl1ppaa".

70. On July 28, 2025, case agents observed that the student profile belonging to Jesus PENA-Najera (DOB: XX/XX/2002), contained a photo that appeared to be the same person that case agents observed in "_fl1ppaa".

71. As a result, case agents began to research PENA-Najera through law enforcement databases and continued to analyze the data provided by Meta. As a result, case agents learned that, on September 22, 2020, PENA-Najera was charged with being an alien present without admission or parole by Immigration and Customs Enforcement (ICE) in Phoenix, Arizona. Additionally, case agents learned that, on September 21, 2021, PENA-Najera was the driver of a vehicle that was stopped by a member of the Western Colorado Drug Task Force (WCDTF) and during that traffic stop $22,790.00 in United States Currency was seized from the vehicle. During the traffic stop, PENA-Najera also provided law enforcement personnel with consent to search his

cellular telephone. During the consent search of his telephone, investigators observed drug related text conversations, photos of large quantities of marijuana, blue M-30 fentanyl pills, and cocaine. Investigators also found several photographs of guns and large bundles of currency. Upon analyzing the content of the data provided by Meta, case agents observed similar content to include photos/videos of firearms and drugs, and conversations related to firearms and drugs.

## I.    Establishment of Confidential Source CS-25-170539

72.    On July 25, 2025, case agents activated DEA Confidential Source (subsequently referred to as CS) CS-25-170539.

73.    On July 26, 2025, PENA-Najera contacted the CS via Instagram, utilizing Instagram account "ceo_fl1ppaa". At that time, PENA-Najera advised the CS that Instagram had deleted his previous account ("_fl1ppaa") and asked the CS for the CS's telephone number.

74.    On July 31, 2025, the CS provided PENA-Najera with a telephone number on Instagram.

75.    On August 4, 2025, the CS received a text message from telephone number **602-210-7823** (**Target Cell Phone),** believed to be PENA-Najera due to the user identifying himself as "flipa", messages received from PENA-Najera's Instagram account and conversations about drug trafficking. At that time, the user of the number **602-210-7823** (**Target Cell Phone)** greeted the CS and stated "This flipa".

76.    On the same date, the CS received a message from Instagram account "ceo_fl1ppaa" stating "…I just hit your line.".

77.    On the same date, the CS subsequently received text messages from number **602-210-7823** (**Target Cell Phone)**. During the text conversation, **602-210-7823** (**Target Cell Phone)** advised that the user had "kitchens going now" and that the user of **602-210-7823** (**Target Cell**

**Phone)** could make what the CS needed. The user of **602-210-7823** (**Target Cell Phone)** also messaged that he, believed to be PENA-Najera, had been "fw the raw F", which case agents believe means that PENA-Najera is selling raw, powder fentanyl. The user of **602-210-7823** (**Target Cell Phone)** then advised the CS that the user could sell the CS "waters", which based on my training and experience I know is common slang for pounds of methamphetamine, for $900.00 to $950.00, depending on the quantity ordered.

78.     Case agents determined telephone number **602-210-7823** (**Target Cell Phone)** has a listed subscriber of Gabriel Herrera, with a listed address of 829 E. Via Maria St, Goodyear, AZ 85338. Based on my training and experience, I know those engaged in drug trafficking will often use false names or other individual's contact information to subscribe telephone numbers in, in order to evade law enforcement.

79.     I believe the **Target Cell Phone**, whose service provider is AT&T ("Service Provider"), a wireless telephone service provider, continues to contain valuable information on this account that could be used for locating the whereabouts of PENA-Najera. Historical information regarding the **Target Cell Phone's** location would also assist in locating PENA-Najera, as it could provide agents additional locations and individuals associated with PENA-Najera and assist in locating PENA-Najera and evidence of his drug trafficking.

80.     Based on my training and experience in locating and apprehending drug traffickers, the data being sought by this warrant will assist in locating PENA-Najera, who case agents believe is the user of **602-210-7823** (**Target Cell Phone),** and likely lead to the discovery of additional evidence related to his drug trafficking. I believe that the call detail records requested will help identify other DTO members and potential sources of supply. I believe that the requested

prospective location data will assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

## TECHNICAL BACKGROUND

81.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

82.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices

to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

83.    I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

84.    As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

85.    I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or

real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

86.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

87.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

88.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded

by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

89.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone's** user or users and may assist in the identification of co-conspirators and/or victims.

90.     I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors

and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

91.     I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

92.     I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the **Target Cell Phone** before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

93.     I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

94.     I know that these records such as those associated with the **Target Cell Phone**, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, but they could also assist in proving one's innocence.

95.     I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the **Target Cell Phone's** location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a **Target Cell Phone's** location and could place a **Target Cell Phone** within close proximity of a crime scene before, during and after a crime. Each carrier uses

their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the **Target Cell Phone**.

96.      I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

97.      In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

98.      I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training

and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

99.     I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

100.    I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name,

physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beamwidth of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

101. Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the **Target Cell Phone**. It is just as important to show cell sites not used by a **Target Cell Phone**, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

102. I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using

government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the **Target Cell Phone** number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

103.   I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the

call detail and specialized location records of a pre-paid **Target Cell Phone**, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

104. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

105. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

106. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

107.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until July 18, 2026, consistent with the omnibus order signed buy Magistrate Judge Stephen C. Dries on July 18, 2025. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the investigation, as such a disclosure would give that wanted person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

108.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NO. 2024R423**

1.      Records and information associated with the cellular device assigned telephone number **602-210-7823** (referred to herein and in Attachment B as the **Target Cell Phone**), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408.

2.      The **Target Cell Phone**.

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NO. 2024R423**

I.      **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider, the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.  The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from June 1, 2024, to the present:

        i.   Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

    1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and

latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

    c.   Information about the location of the **Target Cell Phone** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

       i.   To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

      ii.   This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18 U.S.C. 2(a); and Title 21 U.S.C. §§ 843, 846,  and 841(a)(1), involving Jesus PENA-Najera, and others during the period from June 1, 2024, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.